UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER A. WILSON, | ) | CIVIL ACTION NO. 4:20-CV-944 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| KILOLO KIJAKAZI,[1] | ) | |
| Defendant | ) | |

<u>MEMORANDUM OPINION</u>

I.    INTRODUCTION

Christopher A. Wilson ("Plaintiff"), an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1383(c)(3).

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.  She is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "the officer's successor is automatically substituted as a party."); s*ee also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

This matter is before me, upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 7). After reviewing the parties' briefs, the Commissioner's final decision, and the relevant portions of the certified administrative transcript, I find the Commissioner's final decision is supported by substantial evidence. Accordingly, I recommend that the Commissioner's final decision be AFFIRMED.

II.     BACKGROUND & PROCEDURAL HISTORY

On November 18, 2016, Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act as well as an application for supplemental security income under Title XVI of the Act. (Admin. Tr. 15). In this application, Plaintiff alleged he became disabled as of November 17, 2016, when he was thirty-four (34) years old, due to the following conditions: lymphedema, chronic cellulitis, recurring pneumonia, lower immune system, chronic kidney disease stage 1, and atrial fibrillation. (Admin. Tr. 235). Before the onset of his impairments, Plaintiff worked as a car salesman, vending machine vender, dispatch supervisor and driver, dishwasher, warehouse worker, night auditor, and as a food prep worker in a nursing home. (Admin. Tr. 255).

On May 15, 2017, Plaintiff's applications were denied at the initial level of administrative review. (Admin Tr. 15). On June 30, 2017, Plaintiff requested an administrative hearing. *Id.* On September 18, 2018, Plaintiff, assisted by his counsel,

appeared, and testified during a hearing before Administrative Law Judge Randy Riley (the "ALJ"). *Id*. On December 6, 2018, the ALJ issued a decision denying Plaintiff's applications for benefits. Admin. Tr. 15-26.

On January 31, 2019 Plaintiff requested review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council"). (Admin. Tr. 172-175). On April 9, 2020, the Appeals Council denied Plaintiff's request for review. (Admin. Tr. 1-6).

On June 11, 2020, Plaintiff initiated this action by filing a Complaint. (Doc. 1). In the Complaint, Plaintiff alleges that the ALJ's decision denying the applications is not supported by substantial evidence, and improperly applies the relevant law and regulations. (Doc. 1). As relief, Plaintiff requests that the Commissioner's decision be reversed and that he be granted disability under Title II and Title XVI of the Act, as well as attorney's fees and costs or "such other relief as this Honorable Court may deem just." (Doc. 1, p. 4).

On December 9, 2020, the Commissioner filed an Answer. (Doc. 12). In the Answer, the Commissioner maintains that the decision holding that Plaintiff is not entitled to disability insurance benefits was made in accordance with the law and regulations and is supported by substantial evidence. *Id*. Along with her Answer, the Commissioner filed a certified transcript of the administrative record. (Doc. 13).

Plaintiff's Brief (Doc. 14), the Commissioner's Brief (Doc. 15), and Plaintiff's Reply (Doc. 17) have been filed.  This matter is now ripe for decision.

III.   STANDARDS OF REVIEW

Before looking at the merits of this case, it is helpful to restate the legal principles governing Social Security Appeals.

A. SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and

the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

"In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that Plaintiff is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

### B. STANDARDS GOVERNING THE ALJ'S APPLICATION OF THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).[2] To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed

---

[2] Throughout this Report, I cite to the version of the administrative rulings and regulations that were in effect on the date the Commissioner's final decision was issued. In this case, the ALJ's decision, which serves as the final decision of the Commissioner, was issued on December 6, 2018.

impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. §416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.920(e); 20 C.F.R. § 416.945(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 404.1545(a)(2); 20 C.F.R. § 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. § 423(d)(5); 42 U.S.C. § 1382c(a)(3)(H)(i) (incorporating 42 U.S.C. § 423(d)(5) by reference); 20 C.F.R. § 404.1512; 20 C.F.R. § 416.912; *Mason*, 994 F.2d at 1064.  Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work

experience and RFC. 20 C.F.R. § 404.1512(b)(3); 20 C.F.R. § 416.912(b)(3); *Mason*, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id.* at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

Having reviewed the applicable legal standards, I now turn to the merits of Plaintiff's claims.

IV.   ANALYSIS

Plaintiff raises the following arguments in his brief:

(1)   The ALJ failed to assign great and controlling weight to the opinions of Amrit Greene, M.D., William D. Roberts, M.D., and Brian Hackman, MSW, (Doc. 14, p. 3);

(2)     The ALJ incorrectly concluded that Plaintiff has the residual functional capacity to perform light work for the durational period, and thus can engage in substantial gainful activity because such a determination lacks substantial evidentiary support in the record.  *Id*.

V.     DISCUSSION

A.     THE ALJ'S DECISION DENYING PLAINTIFF'S APPLICATIONS

In his December 2018 decision, the ALJ evaluated Plaintiff's applications for benefits. First, he found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2021.  (Admin. Tr. 17). Then the ALJ proceeded through steps one through five of the sequential evaluation process.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 17, 2016.  *Id*.

At step two, the ALJ found that, during the relevant period, Plaintiff had the following medically determinable severe impairments: lymphedema, asthma, depression, and anxiety.  Admin. Tr. 18.  The ALJ additionally found that Plaintiff had the following non-severe conditions: stage 1 chronic kidney disease, hyperlipemia, atrial fibrillation, hypertension, and glaucomatous optic atrophy.  *Id*

At step three, the ALJ found that, during the relevant period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. Tr. 18-19).

Between steps three and four, the ALJ assessed Plaintiff's RFC. The ALJ found that, during the relevant period, Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 20 C.F.R. § 416.967(b) subject to the following additional limitations:

> he can never climb ladders, ropes, or scaffolds. He should avoid unprotected heights, fumes, gases, vapors and hazardous machinery. He has the mental capacity for light work, limited to simple, routine, repetitive tasks, in a work environment free from fast paced production involving only simple work-related decisions with few, if any, work-place changes. He can interact occasionally with supervisors and co-workers and never with the public.

(Admin. Tr. 20).

At step four, the ALJ found that, during the relevant period, Plaintiff could not engage in his past relevant work. (Admin. Tr. 24).

At step five, the ALJ found that, considering Plaintiff's age, education, and work experience, Plaintiff could engage in other work that existed in the national economy. (Admin. Tr. 25-26). To support his conclusion, the ALJ relied on testimony given by a vocational expert during Plaintiff's administrative hearing and cited the following three (3) representative occupations: small products assembler, DOT #739.687-030; housekeeping cleaner, DOT #323.687-014; electrical accessories assembler, DOT #729.687-010. *Id.*

B.    WHETHER THE ALJ PROPERLY EVALUATED THE MEDICAL OPINION
      EVIDENCE OF RECORD

The Commissioner's regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(1); 20 C.F.R. § 416.927(a)(1). As of the date Plaintiff's application was filed in August of 2016, acceptable medical sources included only licensed physicians, licensed psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language psychologists. 20 C.F.R. § 404.1502(a). The definition was expanded to include other types of sources, like advances practice nurses, in March of 2017. This expansion, however, does not apply to applications filed before March 27, 2017. *Id.* Regardless of its source, the ALJ is required to consider every opinion by acceptable medical sources or by sources who are not acceptable medical sources together with the rest of the relevant evidence. 20 C.F.R. § 404.1527(c); 20 C.F.R. § 404.1527(f); 20 C.F.R. § 416.927(c) 20 C.F.R. § 416.927(f). Regardless of its source, the ALJ is required to consider every medical opinion received together with the rest of the relevant evidence.  20 C.F.R. § 404.1527(c); 20 C.F.R. § 416.927(c).

In deciding what weight to accord competing medical opinions, the ALJ is guided by factors outlined in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c). Under some circumstances, the medical opinion of a "treating source" may even be entitled to controlling weight. 20 C.F.R. § 404.1527(a)(2) (defining treating source); 20 C.F.R. § 416.927(a)(2) (same as 20 C.F.R. § 404.1527(a)(2)); 20 C.F.R. § 404.1527(c)(2) (explaining what is required for a source's opinion to be controlling); 20 C.F.R. § 416.927(c)(2) (same as 20 C.F.R. §404.1527(c)(2)).

Where no medical opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinion: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention.  20 C.F.R. §404.1527(c); 20 C.F.R. § 416.927(c).

Furthermore, the ALJ's articulation of the weight accorded to each medical opinion must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter*, 642 F.2d at 704. This principle applies with particular force

Page 12 of 40

to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion."); 20 C.F.R. § 416.927(c)(2) (same as 20 C.F.R. § 404.1527(c)(2)). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (*quoting Mason*, 994 F.2d at 1066)); *see also Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).

> 1.    The ALJ Properly Evaluated Dr. Green's Opinion About the Diagnosis of Epidermal Nevus Syndrome

On December 21, 2017, Plaintiff was examined by a dermatologist Amrit Greene. Under history of present illness, Dr. Greene wrote:

> HOP: 35 year with a complicated medical history here for evaluation. He has had discoloration of skin since he was born as well as abnormal hair growth on his head. The scalp hairs on his right are lighter than the left although he does dye his hair to match. He also has spots on his face that have been there since birth.
>
> The areas are not symptomatic in any way but he was never given a diagnosis as to what it was.

(Admin. Tr. 933). Under "assessment" Dr. Greene wrote:

> Unclear etiology: combination of patchy hair loss, hyperpigmentation in blaschkoid distribution and renal anomalies could be suggestive of an epidermal nevus syndrome. Although lymphedema is not common there have been reports of it in patients with epidermal nevus syndrome. The hyperpigmentation on his back is not typical since it is not palpable but can have flatter epidermal nevi. Linear and whorled hypermelanosis was on the differential but less likely given the multisystem component

to his disease. Another thought is a rastopathy like noonans given lymphedema but not commonly associated with the hyperpigmentation.

(Doc. 934-935). Dr. Green ordered a biopsy, which was performed on December 28, 2017 by Dr. Adams. (Admin. Tr. 938).

In an undated letter, Dr. Greene wrote:

Christopher Wilson presented to the dermatology clinic at Penn State Hershey 12/2017. A biopsy at that time along with clinical history was most consistent with epidermal nevus syndrome versus overgrowth syndrome. These condition [sic] can be associated with ocular, cardiac, and renal abnormalities that the patient stated he had. He is already followed by cardiology, ophthalmology, and nephrology for those conditions. He was also diagnosed with chronic lymphedema in his left lower leg years ago and has suffered from chronic infections in that leg. He is already using a compression device. Vascular malformations like chronic lymphedema can be associated with the syndromes above and is very likely in his case. This is caused by a genetic mutation that is almost always a post-zygotic—meaning there is little concern for similar condition in his offspring. At this point would continue to manage individual symptoms although there is never a cure. Some symptoms like neurologic can be progressive.

(Admin. Tr. 940).

Plaintiff argues that the ALJ erred by failing to discuss Dr. Greene's diagnosis of EMS in his decision. (Doc. 14, pp. 5, 7) (noting that the ALJ ignored Dr. Greene's diagnosis). Plaintiff is correct that the ALJ does not discuss this opinion, or credit the diagnosis by finding it a medically determinable impairment at step two.

The Commissioner argues:

Dr. Greene never submitted a medical opinion in this case. Rather, Dr. Greene—whose entire treatment record consists of two visits less than

one week apart—treated Plaintiff for "hyperpigmentation" on Plaintiff's back, shoulders, and chest (Tr. 932-38). Dr. Greene stated that Plaintiff's discoloration was "not symptomatic in any way" (Tr. 933). Subsequently, Dr. Green submitted a letter in which [she] recounted Plaintiff's impairments but did not make any statement about Plaintiff's functional ability (Tr. 940). Dr. Greene's treatment notes and letter reciting Plaintiff's impairments are not "medical opinions," which the regulations define as statements "about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands of work activity or adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

And, in any event, it is unclear why Plaintiff believes Dr. Greene's records support his claim. It actually appears Dr. Greene's records lend support to the ALJ's decision, as Dr. Greene stated that Plaintiff was asymptomatic (Tr. 932). To the extent Plaintiff argues that this matter should be remanded merely because the ALJ did not mention Dr. Greene's brief and uneventful course of treatment, the argument elevates form over substance. *Gaddis v. Comm'r of Soc. Sec.*, 2011 WL 815704 at *2 (3d Cir. March 10, 2011).

(Doc. 15, pp. 13-14).

At the outset, the Commissioner is incorrect in arguing that Dr. Greene's letter is not a medical opinion. The definition of "medical opinion" that appears in 20 C.F.R. § 404.1513(a)(2) and 20 C.F.R. § 416.913(a)(2) applies only to applications filed after March 27, 2017. Plaintiff's application was filed on November 18, 2016. Therefore, the applicable definition is a "statement from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, *diagnosis and prognosis*, what you can still do despite impairment(s), and your physical or mental restrictions. 20 C.F.R. § 404.1527(a)(1)

Page 15 of 40

(emphasis added); 20 C.F.R. § 416.927(a)(1). Dr. Greene is an acceptable medical source, and the letter contains a statement that reflects her judgment about Plaintiff's diagnosis and prognosis. Nonetheless, I am not persuaded that the ALJ's failure to address this opinion requires remand in this case.

Remand is not required unless there is reason to believe that it might lead to a different result. *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989); *see also Snedeker v. Colvin*, No. 3:13-CV-970, 2015 WL 1126598 at *7 (N.D. N.Y. Mar. 12, 2015) ("a reviewing court must reverse and remand when an administrative law judge errs when reaching a decision, unless, as a matter of law, the result could not be affected by the error. In other words, administrative legal error is harmless when a reviewing court confidently concludes that the same result would have been reached had the error not occurred.") (internal citations omitted). The opinion at issue is limited to a diagnosis and contains no expression of Plaintiff's functional limitations. Although Plaintiff alleges that this diagnosis is what causes Plaintiff's lymphedema, including this diagnosis, without more, would not change the outcome in this case. The ALJ thoroughly evaluated Plaintiff's lymphedema, and found it to be a medically determinable impairment in its own right.

Accordingly, I find that this error does not require remand.

2.      Whether the ALJ Properly Evaluated Dr. Sklaroff's Testimony

In his decision, the ALJ summarized that:

Page 16 of 40

Robert Sklaroff, MD, an independent medical expert, testified the claimant can sit, stand or walk six hours each during an eight-hour workday with normal breaks, should avoid ladders, unprotected eights, vapors, dust, and fumes. Dr. Sklaroff noted the claimant's blood tests were normal, he had no edema, and Exhibit 14F showed no evidence of deep vein thrombosis, and no risk of pulmonary embolism. Dr. Sklaroff indicated the claimant's cardia findings are benign, with no recent treatment noted. Dr. Sklaroff stated Exhibit 22F indicated the claimant's pulmonary issue is doing well (Hearing testimony).

(Admin. Tr. 22).

The ALJ gave Dr. Sklaroff's opinion "great" weight. In doing so he explained:

This opinion is supported by the longitudinal treatment notes, which generally show the claimant has normal gait, normal muscle tone, good muscle tone, normal deep tendon reflexes, intact sensation, normal range of motion, and no edema (3F; 9F; 12F; 14F; 16F; 22F; 25F; 26F). This opinion is also consistent with the claimant's activities of daily living, which shows he cares for his son, drives, shops in stores, and has no difficulty with personal care activities (5E). Further, Dr. Sklaroff is a highly qualified expert who had the opportunity to review the claimant's records. Therefore, the undersigned gives Dr. Sklaroff's opinion great weight.

(Admin. Tr. 22).

Plaintiff argues that the ALJ's evaluation of this opinion is improper and not

supported by the record because:

The ME is an oncologist. (R. 954.) His specialty is in an area *other than* what is required here. He was clearly ignorant of ENS as a diagnosis, much less the symptoms, causes and treatment of the same. It appears that he never prescribed treatments of the type Claimant has had here including, most notably, a compression pump (though he did agree that one might be properly prescribed, "if it works").

(Doc. 14, p. 9). In short, Plaintiff argues that: (1) the ALJ's assessment that Dr. Sklaroff's opinion is "supported by the longitudinal treatment notes," is not supported by substantial evidence; and (2) the ALJ's assessment that Dr. Sklaroff's opinion is entitled to weight because he is a specialist, is not supported by substantial evidence. Plaintiff also argues that the ALJ improperly applied 20 C.F.R. § 404.1527(c)(1) and 20 C.F.R. § 416.927(c)(1) because the ALJ gave more weight to Dr. Sklaroff (a nonexamining source) than was given to the treating sources.

In response, the Commissioner argues:

> The ALJ gave Dr. Skarloff's opinion great weight, noting that the opinion was consistent with Plaintiff's activities of daily living, which showed that Plaintiff could go bowling, play with his children, and perform all activities of daily living independently (Tr. 22). The ALJ also noted that Dr. Sklaroff was a highly qualified expert who specialized in oncology, hematology, and internal medicine (Tr. 22, 51). Thus, the ALJ fully considered Dr. Sklaroff's opinion and provided an adequate explanation for according his opinion great weight.

> Plaintiff understandably disagrees with the weight the ALJ gave to Dr. Sklaroff's opinion, but his arguments to the Court for overturning the ALJ's analysis are meritless. Plaintiff spends the first several pages of his argument attempting, in essence to convince the Court that his lymphedema was likely attributable to an epidermal nevus syndrome (ENS) (*See* ECF No. 14 at pp. 4-6) However,  "the etiology of Plaintiff's lymphedema is irreverent, because the salient inquiry is whether Plaintiff experienced work-related limitations. *See e.g.*, *Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir. 1990) (diagnosis of impairment does not establish entitlement to benefits; claimant must show impairment results in disabling limitations).

> Here, Dr. Sklaroff considered all the records relating to Plaintiff's lymphedema—including the records mentioning ENS as a possible

etiology—and nevertheless determined that these records indicated he could perform the exertional requirements of a limited range of light work (Tr. 52-65). Therefore, the Court should affirm the ALJ's consideration of Dr. Sklaroff's opinion even if the Court were inclined to accept his assertions regarding ENS.

(Doc. 15, pp. 9-11) (internal footnote omitted).

First, Plaintiff argues that the ALJ's assessment that that Dr. Sklaroff's opinion is "supported by the longitudinal treatment notes," is not supported by substantial evidence. The applicable regulations provide that, "[g]enerally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4); 20 C.F.R. § 416.927(c)(4). Plaintiff argues that Dr. Sklaroff's opinion is not consistent with the longitudinal records because he did not review them, and instead relied heavily on the opinion of a state agency medical reviewer. I am not persuaded. In addition to referencing the opinion of the state agency medical consultant, Dr. Sklaroff also referenced exhibits 12F (the rheumatology treatment records), 14F (the neurology treatment records), 16F (an EKG), 17F (the dermatology records from Dr. Greene), 19F (Dr. Roberts' letters), and 22F (a pulmonary evaluation). (Admin. Tr. 53-59).

Second, Plaintiff argues that the ALJ's assessment that Dr. Sklaroff's opinion is entitled to weight because he is a specialist, is not supported by substantial evidence. The applicable regulations provide that "[w]e generally give more weight to the medical opinion of a specialist about medical issues related to his or her area

of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R.

§ 404.1527(c)(5); 20 C.F.R. § 416.927(c)(5). In his decision, the ALJ supported his

decision to rely on Dr. Sklaroff's opinion by explaining that Dr. Sklaroff "is a highly

qualified expert." The ALJ does not, however, discuss what field or specialty Dr.

Sklaroff is expert in. During the administrative hearing, Dr. Sklaroff testified he

specializes in medical oncology, hematology, and internal medicine." (Admin. Tr.

51, 952-963). Dr. Sklaroff testified he had never diagnosed a patient with epidermal

nevus syndrome and was not familiar with the symptoms of that diagnosis. (Admin.

Tr. 64). Dr. Sklaroff looked up the condition during the hearing, and testified that:

> Now, when I'm looing at epidermal nevus syndrome, at emedicine
> Medscape, which is basically written for docs, and I'm going to skip
> through the physiology, and I'm going to go to the treatment schedule
> and see what it says.
>
> Medical therapy is often challenging. Epidermal nevi are usually
> resistant to topical and interlesional—well, nevus is a---like a little
> mole. So I'm not sure that this—this fits. This fits more the way I was
> reading the progress note. This has nothing to do with edema.
> Epidermal nevus syndrome is little nevi on—you know, little moles
> with little black dots on them sometimes. You have to make sure it's
> not melanoma.
>
> So that's it. I'm not seeing a relationship there with the leg issue, which
> is the grovment (phonetic) of the case.

 (Admin. Tr. 66). I agree with Plaintiff that, based on this testimony, Dr. Sklaroff is

not a "specialist" in ENS. Nothing in the record suggests whether, as a specialist in

internal medicine, Dr. Sklaroff is a "specialist" in treating lymphedema, kidney

disease, hyperlipidemia, atrial fibrillation, hypertension, or glaucomatous optic atrophy. Thus, I agree that, to the extent that he did so, the ALJ's decision to give greater weight to Dr. Sklaroff as a "specialist" is not supported by the record. Nonetheless, because the ALJ's cited another basis in support of the decision to credit Dr. Sklaroff's opinion—its consistency with the longitudinal record—I am not persuaded that remand is required.

    3.   Whether the ALJ Properly Evaluated Dr. Roberts' Letters

On June 28, 2018, Dr. Roberts wrote the following letter:

> Christopher a Wilson is a 35-year-old gentleman with an unusually large number of ongoing chronic and acute medical problems for many years. He has history of congenital solitary kidney and a degree of chronic kidney disease with proteinuria and hypertension, and for many years has been struggling with left saphenous vein reflex disease and chronic pain and lymphedema in his left leg, with recurring episodes of cellulitis. In addition that he has had paroxysmal atrial fibrillation and has had transient neurologic problems including transient global amnesia. He does have asthma and has had episodes of pneumonia in the past requiring hospitalization. His episodes of atrial fibrillation and cellulitis have required hospitalizations as well. He has postsurgical hypothyroidism since removal of the thyroid nodule recently and was evaluated recently by specialists and found to have epidermal nevus syndrome, but details of that rare condition would have to be obtained from his specialists. Obviously with his chronic leg swelling and pain and frequent exacerbations with infections, cardia, pulmonary, kidney, and musculoskeletal problems, Chris has found it difficult to maintain employment. Records containing more specific information can be obtained through the medical records department in our practice.

(Admin. Tr. 949).

On July 26, 2018, Dr. Roberts wrote the following letter:

Page 21 of 40

This is to certify that Christopher A Wilson has numerous chronic illnesses as described in my 6/28/2018 letter, and because of those chronic illnesses, he is not able to perform andy [sic] job, including simple jobs that require maintaining  a position where his legs are dependent (sitting, standing) for more than a short time.

Additionally, his neurological problems, including headaches and amnesia as previously documented, interfere with concentration and performance of repetitive activities and simple jobs.

His exam supports this conclusion, including impressive LEFT leg lymphedema Other documentations are in his record.

His conditions are chronic and will last indefinitely.

(Admin. Tr. 948).

In his decision, the ALJ gave Dr. Roberts' opinions "little" weight. In doing so the ALJ explained:

The record in this case contains a July 2018 statement from William D. Roberts, MD, the claimant's primary care provider, that the claimant "is not able to perform andy [sic] job, including simple jobs that require maintaining a position where his legs are dependent for more than a short time. Additionally, his neurological problems including headaches and amnesia as previously documented, interfere with concentration and performance of repetitive activities and simple jobs" (19F/2). Insofar as this opinion states claimant is unable to work, it is entitled to no special significance as it is on an issue reserved to the Commissioner (20 CFR 404.1527(d), 416.927(d)). This opinion is unsupported by his treatment notes, which largely show the claimant is in no distress and well developed with normal range of motion (25F). This opinion is also unsupported because it is a summary statement with limited explanation. Further, this opinion is inconsistent with the claimant's activities of daily living, which show he drives, does laundry, shops in stores, and prepares meals (5E). Accordingly, the undersigned gives Dr. Robert's opinion little weight.

(Admin. Tr. 23).

Plaintiff argues that the ALJ should not have discounted this opinion. However, his objection to this opinion appears to be that more weight was given to the testimony of a non-examining medical expert who testified at the hearing than was given to treating source Dr. Roberts.

In response, the Commissioner argues:

> In this [sic] letters, Dr. Roberts alleged that Plaintiff could not perform any work and would have to keep his legs elevated (Tr. 948-49). The ALJ considered these letters, but properly rejected them for the reasons already discussed. Plaintiff maintained a level of activity consistent with at least light work, such as participating in bowling tournaments, care for his young children, and independently perform all daily activities (Tr. 22-23, 404, 423-24, 980, 1009). Further, the record does not indicate that Plaintiff had to elevate his legs to alleviate his swelling. In fact, the record shows the opposite (Tr. 396).
>
> Furthermore, Dr. Roberts' assertion that Plaintiff's conditions rendered him unable to work is not an "opinion" within the meaning of the regulations. According to the regulations, such statements are not entitled to any special significance because disability determinations are legal determinations—rather than medical opinions—that are reserved to the Commissioner (Tr. 22-23). 20 C.F.R. §§ 404.1520b(c)(3), 416.920b(c)(3). Therefore, the ALJ gave good reasons for rejecting Dr. Roberts' opinion.

(Doc. 15, pp. 14-15).

The Commissioner, once again, relies on inapplicable authority related to medical opinions on issues reserved to the Commissioner. 20 C.F.R. § 404.1520b(c)(3) and 20 C.F.R. § 920b(c)(3) apply to claims filed after March 17,

2017. Plaintiff's application was filed on November 18, 2016. The applicable

regulations on this issue provide that:

> Opinions on some issues, such as the examples that follow, are not medical opinions as described in paragraph (a)(1) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination of disability.

> (1)   Opinion that you are disabled. We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

> (2)   Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requires of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§ 404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

> (3)   We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.

20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).

Dr. Roberts assessed that Plaintiff would not able to perform any job. This statement in his July 2018 letter is an opinion on an issue reserved to the Commissioner pursuant to 20 C.F.R. § 404.1527(d) and 20 C.F.R. § 416.927(d). The ALJ correctly identified it as such, and it is not entitled to any special significance. Accordingly, I am not persuaded that this statement was improperly discounted.

Dr. Roberts also assessed several functional limitations, including that Plaintiff: could not sit or stand for more than "short" periods of time; had difficulty concentrating; had difficulty with repetitive tasks due to headaches and amnesia; and had difficulty with "simple jobs" due to headaches and amnesia.[3] I find that the ALJ cited a proper basis to discount this opinion.

First, the ALJ noted that the letters were not well explained. I agree. Dr. Roberts does not define the length of "short" periods of time or describe what he means by "simple" jobs. *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

Second, I am not persuaded by Plaintiff's argument that the ALJ's conclusion that Dr. Roberts' assessment that Plaintiff could only sit or stand for "short" periods

---

[3] Although the Commissioner argues that Dr. Roberts' opinion that Plaintiff would need to elevate his legs was properly discounted, a leg elevation limitation is not discussed in either letter.

of time is not supported by substantial evidence. Plaintiff suggests that this limitation

is supported by the following evidence:

> Prior to his last day of work on November 17, 2016 (R. 235), the Claimant had been missing time from work due to his conditions. While doing his work, "his leg frequently swells up considerable after about 2 hours of work." (R. 317) (note of 6/15/16). His leg exam was "abnormal" and edema was noted, even though he "ha[d] compression stocking on." (R. 318.) (note dated 12/29/16.) He was unable to even get out of a car when his child went to the doctor due to "decreased stamina and extreme tiredness." (R. 398 at 14) (note dated 12/12/16.) "Lymphedema is increased with . . . activity." (R. 404) (note dated 12/7/16.) Swelling was noted to increase with activity. "He exhibits edema." (R. 393) (note dated 12/19/16). At about the same time, the Claimant was given many instructions about how to deal with the left leg swelling and pain including by using JUZO compression stockings, Rosidal bandages, Solaris Calf compression wraps, and a compression pump to be use "daily for 1 hour each session." (R. 396) (note dated 12/14/16). He was also educated about "self lymph drainage techniques of the groin and thigh." (R. 397.)

(Doc. 14, p. 4). Although I agree that this evidence is consistent with a finding that

Plaintiff has lymphedema and swelling in his left lower leg, I am not persuaded that

this is enough to overcome the lack of specific definition of Plaintiff's functional

capacity in Dr. Roberts' opinion letters. All other sources assessed that Plaintiff

could: stand for four or more hours and/or walk for four or more hours; and sit for

between five and six hours. (Admin. Tr. 97) (opinion of state agency medical

consultant, Dr. Clark, that Plaintiff could stand and/or walk for four hours and sit for

six hours); (Admin. Tr. 628) (medical source statement by consultative examiner,

Dr. Grabon, that Plaintiff could stand for four hours, walk for four hours, and sit for

five hours); (Admin. Tr. 60) (testimony of Dr. Sklaroff that Plaintiff could sit, stand, and walk up to six hours).

Last, given the lack of specificity about the standing and walking limitations, I am not persuaded that the ALJ's decision to credit Dr. Sklaroff (a non-examining source) instead of Dr. Roberts (a treating source) on this issue was inappropriate under the regulations.

      4.      Whether the ALJ Properly Evaluated The Opinion of Therapist Hackman

On September 17, 2018, Therapist Hackman completed a check-box type medical source statement about the limitations caused by Plaintiff's mental impairments. (Admin. Tr. 1070-1072). On the check-box form, Therapist Hackman was asked to rate Plaintiff's ability to perform certain work-related activities based on the following scale: excellent; good (the individual can perform the activity satisfactorily 2/3 of the time); fair (the individual can perform the activity 1/3 of the time); and poor (the individual can perform the activity less than 1/3 of the time). Therapist Hackman rated Plaintiff's performance as either "fair" or "poor" in all activities assessed.

Therapist Hackman assessed that Plaintiff's ability to perform the following activities is "fair": remember locations and work like procedures; understand and remember short, simple instructions; carry out short, simple instructions; understand

and remember detailed instructions; maintain attention and concentration for extended periods; work with or near others without being distracted by them; ask simple questions or request assistance; adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.

Therapist Hackman assessed that Plaintiff's ability to perform the following activities is "poor": carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek; perform at a consistent pace; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers and peers; maintain socially appropriate behavior; and respond appropriately to changes in the work setting.

The area under the question, "what supports this assessment?" was left blank. (Admin. Tr. 1072). In response to the question "what medical/clinical findings support this assessment?" Therapist Hackman wrote "refer to PCP/medical specialists." *Id.*

In his decision, the ALJ gave "little" weight to Therapist Hackman's opinion. In doing so, the ALJ explained:

This opinion is unsupported by his treatment notes, which largely show the claimant responded positively to counseling (23F). This opinion is also unsupported because it is a checklist with minimal explanation. Further, this opinion is inconsistent with the claimant's lack of inpatient mental health treatment or referral to crisis intervention. Accordingly, the undersigned gives Dr. Hackman's opinion little weight.

(Admin. Tr. 24).

Plaintiff argues:

Here, the ALJ gave a Social Security records evaluator "great" weight. (R. 23-24.) Conversely, the ALJ gave "little weight" to the treating source opinion of his mental heath treating source. (R.24.) This was in error. The Social Security evaluator provided a records' review opinion dated April 18, 2017. (R. 74-80.) As of the time of this opinion, there were only about 10 pages of mental health records in the file, covering about 3 visits (R. 609-619) for visits in February and March 2017. After this evaluator's report of April 18, 2017, the Social Security record was supplemented to include treatment records from February 24, 2017 to September 7, 2018—nearly 82 pages of mental health treatment records. (R. 897-1068.) It was upon these records, and the items reflected in them that the treating source was able to make the opinions he did and which are reflected in his opinion. (R. 1069-1072.) These mental health opinions, if true, would render Claimant unemployable per the VE's testimony. (R. 70-72.)

Had the ALJ placed the proper weight on the mental health treating source's opinion, as he should have, the result would have been that the Claimant is disabled under the Act.

(Doc. 14, pp. 11-12).

In response, the Commissioner argues:

Turning to Plaintiff's mental disorders, Plaintiff cites to the check-mark assessment submitted by social worker Brian Hackman, who claims that Plaintiff had "fair" or "poor" ability to function in every area of mental functioning (Tr. 24, 1070-72). Plaintiff does not offer any evidence in support of Dr. Hackman's findings, and instead makes a

bare assertion that the mental health records show he was unemployable (*See* ECF No. 14, at p. 12). Actually, those mental health records show full orientation, normal mood, normal affect, intact memory, intact cognitive function, normal thought content, fluent speech, appropriate language, sufficient attention, adequate concentration, normal behavior, age appropriate fund of knowledge, fair insight, and normal judgment (Tr. 24, 753, 761, 778, 801, 1091, 1095, 1146). Notably, Plaintiff never received any mental health treating until after he filed for disability benefits. As a result, the ALJ properly rejected Mr. Hackman's assessment.

(Doc. 15, pp. 15-16).

I am not persuaded by Plaintiff's argument about Therapist Hackman's report. The records at issue include an initial interdisciplinary assessment dated February 24, 2017, and several handwritten treatment records from a psychiatrist. In May, June, July, and August of 2017, Plaintiff exhibited a depressed mood and anxious affect. (Admin. Tr. 1057-1068). In October, and December of 2017 Plaintiff's mood in affect were normal. (Admin. Tr. 1046-1054). In January and May 2018, Plaintiff's mood was "confused." (Admin. Tr. 1047-1042). However, the descriptions of Plaintiff's mood in these hand-written treatment records for September 2017, August 2018, and September 2018 are not legible. Counseling records from Therapist Hackman state that there were "no significant changes reported or observed" in mood, affect, thought processes, orientation, motor activity and speech, behavior, and functioning during every session. (Admin. Tr. 1000-1035). These records also

document a positive response to therapy. *Id.* The records also document reports of anger outbursts by Plaintiff. *Id.*

The ALJ's determination that the "fair" and "poor" ratings across all categories is not supported by these records is, in fact, supported by substantial evidence. I also note that the ALJ limited Plaintiff to environments where he would be expected to interact with coworkers and supervisors occasionally (generally understood to mean for two hours per day or less), and no interaction with the public. Accordingly, I am not persuaded that remand is required for further evaluation of Therapist Hackman's opinion.

C.   WHETHER THE ALJ'S EVALUATION OF PLAINTIFF'S STATEMENTS ABOUT HIS SYMPTOMS IS SUPPORTED BY SUBSTANTIAL EVIDENCE

When asked how often he elevated his legs, Plaintiff testified:

A   Majority of the day.

Q   How do you do that?

A   I'll sit on my recliner and have my leg propped up with pillows to keep the swelling down.

. . . .

Q   . . . are there any other times where you need to elevate your leg during the day?

A   If I'm on it too long, I'll have to sit down and have it elevated to keep the swelling down as much as possible.

Q   If you're on—if you're on what too long?

Page 31 of 40

A      My leg.

Q      The left leg?

A      Yes.

Q      Okay. And what would be too long? What is being up too long
       that it starts to swell?

A      Half an hour to an hour.

(Admin. Tr. 41, 45). When asked about his compression pump, Plaintiff testified:

A      I have a light pump to help with compression.

Q      You have  pump?

A      Yes.

Q      Is this something like—is it battery operated? You plug into the
       wall?

A      You plug into the wall.

Q      And how often do you use that a day?

A      Twice a day.

Q      And for how long?

A      An hour each time.

Q      Okay. When you use it, are you—what's your body position
       when you're using it?

A      I'm laying down.

Q      You're reclined?

A      Yes. Okay.

Q     When you're finished using it, do you do anything else?

A     Yes. My wife has to massage from my armpit area down by whole left side of my leg to get that fluid flowing again—let it come back down.

Q     All right. And for how long have you been doing that?

A     Ever since I got the machine.

Q     Okay.

A     Which was—I don't know the exact date.

Q     Well, you went into the hospital in November 2016, Exhibit 3-F. Using that as a reference point, when you got out of the hospital, how long was it that you started using the machine?

A     It took a week for it to get to my house. So—

Q     Okay. So late 2016?

A     Yes.

Q     Are you still using that now?

A     Yes, sir.

Q     And at all time in between, have you used it at the same rate, in terms of two times a day, one hour each time?

A     Yes, sir.

(Admin. Tr. 43-44).

In his decision, the ALJ found that Plaintiff's impairments could be excepted to cause the symptoms alleged, but that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not consistent with the

medical evidence of record. (Admin. Tr. 20-21). The ALJ did not specifically discuss

Plaintiff's testimony regarding leg elevation or use of a compression device for one

hour at a time twice per day. He did, however, discount Plaintiff's testimony about

"swelling in his legs" as follows:

> As for the claimant's statements about the intensity, persistence and
> limiting effects of his symptoms, they are inconsistent because of the
> following reasons. The claimant argues he is unable to work because
> he needs to be hospitalized for two to three weeks at a time, and has
> difficulty lifting, walking, and climbing stairs. He states he must rest
> five to ten minutes after walking five to ten minutes and has difficulty
> handling stress and changes in routine, and he has swelling in his legs
> (Hearing Testimony; 5E). The record shows the claimant has
> lymphedema (3F). For these conditions, the claimant received a
> compression device and medication (17F). Longitudinal treatment
> notes do not support the claimant's allegations. These notes generally
> show the claimant has normal gait, normal muscle tone, good muscle
> tone, normal deep tendon reflexes, intact sensation, normal range of
> motion and no edema (3F; 9F; 12F; 14F; 16F; 22F; 25F; 26F). During
> an April 2017 internal medicine consultative examination, the claimant
> had normal gait, walked on heels and toes without difficulty, full squat,
> stance normal, used no assistive devices, needed no help changing for
> exam or getting on and off the exam table, and was able to rise from a
> chair without difficulty. The record shows the claimant had stable and
> nontender joints, no evidence joint deformity, no redness, no heat, and
> no effusion. He had a negative straight leg raising test. He had no
> scoliosis, no kyphosis, and no abnormality in the thoracic spine. He had
> normal and equal deep tendon reflexes, normal and equal pulses,
> normal strength, and no sensory deficits. he had intact hand and finger
> dexterity and full grip strength (7F). A March 2017 treatment note
> states the claimant "has always been active" (22F/17). The claimant's
> activities of daily living are also inconsistent with his allegations. He
> notes he prepares meals, cleans, does laundry, does dishes, cares for his
> son, and does not have difficulty with personal care activities (5E).

(Admin. Tr. 21).

The Commissioner's regulations define "symptoms" as the claimant's own description of his or her impairment. 20 C.F.R. § 404.1502(i); 20 C.F.R. § 416.902(i). The ALJ is not only permitted, but also required, to evaluate the credibility of a claimant's statements about all symptoms alleged and must decide whether and to what extent a claimant's description of his or her impairments may be deemed credible. In many cases, this determination has a significant impact upon the outcome of a claimant's application, because the ALJ need only account for those symptoms – and the resulting limitations – that are credibly established when formulating his or her RFC assessment. *Rutherford*, 399 F.3d at 554. To facilitate this difficult analysis, the Commissioner has devised a two-step process that must be undertaken by the ALJ to evaluate a claimant's statements about his or her symptoms.

First, the ALJ must consider whether there is an underlying medically determinable impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the symptom alleged. 20 C.F.R. § 404.1529(b); 20 C.F.R. § 416.929(b). If there is no medically determinable impairment that could reasonably produce the symptom alleged, the symptom cannot be found to affect the claimant's ability to do basic work activities. 20 C.F.R. § 404.1529(b); 20 C.F.R. § 416.929(b); SSR 16-3p, 2016 WL 1119029.

Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms which can be reasonably attributed to a medically determinable impairment. 20 C.F.R. § 404.1529(c)(1); 20 C.F.R. § 416.929(c)(1). Symptoms will be determined to reduce a claimant's functional capacity only to the extent that the alleged limitations and restrictions can reasonably be accepted as consistent with objective medical evidence and other evidence of record. 20 C.F.R. § 404.1529(c)(4); 20 C.F.R. § 416.929(c)(4). However, an ALJ will not reject statements about the intensity, persistence, or limiting effects of a symptom solely because it is not substantiated by objective evidence. 20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3). Instead, the ALJ will evaluate the extent to which any unsubstantiated symptoms can be credited based on the following factors: the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; any factor that precipitates or aggravates the claimant's pain or other symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her pain or other symptoms; any treatment, other than medication, the claimant receives or has received for relief of his or her pain or other symptoms; any measures the claimant uses or has used to relieve his or her pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and any

other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

An ALJ's findings based on the credibility of a claimant are to be accorded great weight and deference, since an ALJ is charged with the duty of observing a witness's demeanor and credibility. *Frazier v. Apfel*, No. 99-CV-715, 2000 WL 288246, at *9 (E.D. Pa. Mar. 7, 2000) (*quoting Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). An ALJ is not free to discount a claimant's statements about his or her symptoms or limitations for no reason or for the wrong reason. *Rutherford*, 399 F.3d at 554.

Plaintiff argues:

> When the ALJ points to activities that the Claimant *can* do, which the Claimant freely admits, that does not diminish the other testimony provided by the Claimant as to what he *cannot* do. It is not inconsistent for the Claimant to say on the one hand that he can do some activity, but that he also needs to recline for an hour, 2 times a day to run his compression pump and elevate his legs throughout the day, on the other hand. He simply does activity when he can, in between leg elevation, compression pumping, pain, and swelling.

(Doc. 15, p. 13).

I note that Plaintiff's credibility argument is not included in the statement of errors, is raised under a heading related to the ALJ's evaluation of the RFC assessment, and does not include any citation to the regulations related to the ALJ's

evaluation of a claimant's testimony about his or her symptoms.  As a result, this argument was overlooked by the Commissioner.

However, I am not persuaded by Plaintiff's argument that the ALJ improperly excluded the limitations that Plaintiff be limited to occupations requiring that he elevate his foot while seated or that he needs to recline while using a compression pump. This evidence is relevant to one of the factors outlined in 20 C.F.R. § 404.1529(c)(3) and 20 C.F.R. § 416.929(c)(3)—treatment and measures the claimant uses to relieve his symptoms. However, nothing Plaintiff has cited suggests that the two one-hour session with the compression pump would need to take place during work hours. Furthermore, the ALJ's assessment that Plaintiff's testimony that he must elevate his feet most of the day appears to be inconsistent with Plaintiff's activities of daily living, and is not supported by any medical opinion of record (including those Plaintiff argues should have been credited). Thus, even assuming it was an error for the ALJ to not explain his consideration of the measures and treatment Plaintiff received before discounting his testimony, I am not persuaded that this would result in a different outcome here.

D.   WHETHER THE ALJ'S RFC ASSESSMENT IS SUPPORTED BY SUBSTANTIAL EVIDENCE

In his final argument, Plaintiff contends that the following three restrictions should have been incorporated in the RFC assessment: (1) that Plaintiff be permitted

to recline for 2 hours during the workday to run his compression pump; (2) that Plaintiff be permitted to elevate his legs throughout the workday; and (3) that Plaintiff would be "off task" 15% or more of the workday.

One oft-contested issue in this setting relates to the claimant's residual capacity for work in the national economy. As discussed above, a claimant's RFC is defined as "the most [a claimant' can still do despite [his or her] limitations," taking into account all of a claimant's medically determinable impairments. 20 C.F.R. § 404.1545; 20 C.F.R. § 416.945. In making this assessment, the ALJ is required to consider the combined effect of all medically determinable impairments, both severe and non-severe. 20 C.F.R. § 404.1545; 20 C.F.R. § 416.945. Although such challenges most often arise in the context of challenges to the sufficiency of vocational expert testimony, the law is clear that an RFC assessment that fails to take all of a claimant's credibly established limitations into account is defective. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 n. 8 (3d Cir. 2005) (noting that an argument that VE testimony cannot be relied upon where an ALJ failed to recognize credibly established limitations during an RFC assessment is best understood as a challenge to the RFC assessment itself); *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 147 (3d Cir. 2007) (noting that an ALJ must include in the RFC those limitations which he finds to be credible).

Moreover, because an ALJ's RFC assessment is an integral component of his or her findings at steps four and five of the sequential evaluation process, an erroneous or unsupported RFC assessment undermines the ALJ's conclusions at those steps and is generally a basis for remand.

For the same reasons articulated elsewhere in this opinion, I am not persuaded by Plaintiff's argument that limitations related to Plaintiff's testimony on the issue of reclining for compression pump treatments or elevating his legs. On the issue of the concentration limitation, the only support for this limitations appears to be rooted in the properly discounted opinion of Therapist Hackman. Accordingly, I am not persuaded that these limitations were improperly excluded from the RFC assessment.

VI.   CONCLUSION

Plaintiff's request for relief will be DENIED as follows:

(1)   The final decision of the Commissioner will be AFFIRMED.

(2)   Final Judgment will be issued in favor of the Commissioner.

(3)   An appropriate order shall issue.

Date: March 7, 2022                    BY THE COURT

                                       _s/William I. Arbuckle_
                                       William I. Arbuckle
                                       U.S. Magistrate Judge